CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ANUPAM DHILLON (CABN 324746)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7124
    FAX: (415) 436-7234
    Anupam.Dhillon@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:26-cr-00111 WHO |
| Plaintiff, | **UNITED STATES' MOTION FOR DETENTION** |
| v. | Hearing Date: March 25, 2026 |
| | Hearing Time: 11:00 am |
| KYLE REYNALDO BUTLER, | Courtroom:    Courtroom G, 15th Floor |
| Defendant. | Hon. Lisa J. Cisneros |

## I.    INTRODUCTION

Defendant Kyle Reynaldo Butler has been indicted with one count of being a Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). His serious criminal history, including while on probation and parole, in combination with his reckless conduct in this case, establish by clear and convincing evidence that he presents a danger to the community that no condition or combination of conditions can reasonably mitigate, and by a preponderance of the evidence that he presents a risk of nonappearance that no condition or combination of conditions can reasonably mitigate. For these reasons, and as explained in greater detail below, the Government respectfully requests that the defendant be detained to safeguard the community and his appearance at trial.

///

## II.   FACTUAL BACKGROUND

### A.  The Defendant's Criminal History

The defendant's criminal history is lengthy and violent. It started over 20 years ago. In 2005, weeks before turning 18, the defendant was arrested for and charged with brandishing a replica firearm and robbery, but the case was handled informally and there was no conviction. While that incident could have deterred the defendant from engaging in further behavior, it seemed to have only emboldened him.

In 2006, the defendant was convicted of his first criminal offense as an adult, threatening with the intent to terrorize (Cal. Pen. Code § 422), and he was subsequently sentenced to 15 days in jail and two years' probation. In 2008, he was convicted of battery (Cal. Pen. Code § 242) and sentenced to three years' probation. While on probation, in the first half of 2009, the defendant was convicted of burglary (Cal. Pen. Code § 459) and sentenced to 16 days in jail and three years' probation. Later in 2009, while on probation, he was convicted of driving with a suspended license (Cal. Veh. Code § 14601.2(a)) and sentenced to three years' probation. In 2010, while on probation, the defendant was convicted of driving under the influence (Cal. Veh. Code § 23152(a)) and sentenced to 15 days in jail and three years' probation. Later that year, while on probation, he was convicted of receipt of stolen property (Cal. Pen. Code § 496(a)) and sentenced to 120 days in jail and three years' probation.

In 2012, while on probation for the above offense, the defendant was convicted of robbery (Cal. Pen. Code § 211) and assault with great bodily injury (Cal. Pen. Code § 245(a)(1)). He was sentenced by the San Francisco Superior Court to six years in prison for the first offense and one year for the second offense, to run concurrently. The details of the offense are as follows: the defendant and his cousin were riding a Muni bus. As they began to depart the bus, the defendant approached a minor victim from the back, placed the minor victim in a headlock, lifted the minor victim off his feet, and choked the minor victim unconscious – while the defendant's cousin stole the minor victim's cell phone. The minor victim was hospitalized after the incident. A couple of weeks later, the defendant and his cousin attempted to do the same to a different victim, also on a Muni bus. The defendant placed a victim in a headlock, however, that victim was able to get away.

In 2018, after being released from prison on parole, the defendant was convicted of violating his parole (Cal. Pen. Code § 3000.08) and sentenced to 124 days in jail. In 2019, he was convicted of reckless

driving (Cal. Veh. Code § 23103(a)), hit and run (Cal. Veh. Code § 20002(a)), driving with a suspended license (Cal. Veh. Code § 14601.2(a)), and obstruction (Cal. Pen. Code § 148(a)(1)) and was sentenced to 90 days in jail. In 2020, the defendant was convicted of driving with a suspended license and driving under the influence and was sentenced to 120 days in jail. In 2023, he was convicted of vandalism (Cal. Pen. Code § 594(b)(1)) and sentenced to one year probation. And finally, also in 2023, the defendant became the subject of a criminal protective order requiring him not to contact, harass, or abuse a female victim. The defendant was present in court when the order was issued. The order explicitly prohibited the defendant from possessing a firearm or ammunition.

In addition to the defendant's criminal convictions, he has been arrested for and charged with, but not convicted of, many other crimes over the last 20 years, including: battery with serious bodily injury; instances of robbery not discussed above (on several occasions); infliction of corporal injury on a spouse or cohabitant and/or domestic battery (on several occasions, with the most recent being in October 2025 and after the events underlying this case); and possessing and/or selling controlled substances.

## B. The Instant Matter

On July 27, 2025, at about 3:45 am, San Francisco Police Department (SFPD) responded to reports of multiple gun shots in the Mission District. SFPD did not see any suspects or victims at the scene but recovered 17 spent cartridge casings that had been discharged by a firearm. SFPD obtained surveillance video footage capturing the shooting. The surveillance video shows two individuals, one later identified as the defendant, arriving in the area in a gold Toyota Corolla, circa 2000, around 12:15am. After parking, they entered a residence and stayed inside for over three hours. Once they emerged, and as the defendant was walking back towards the parked vehicle, he pulled out a firearm from his waistband with a visible extended magazine and discharged it several times into the air. After the defendant reached the parked vehicle, but before he entered, he discharged his firearm several more times into the air. And once the defendant got into the vehicle as the front passenger and while the vehicle was driving through an intersection, the defendant stuck his arm out the front passenger window and discharged the firearm several more times (see below). The surveillance video depicts nearby bystanders on foot and in vehicles who panicked after each set of shots. While fortunately none of them were injured, the defendant displayed a complete disregard for their safety as he repeatedly discharged his firearm.

UNITED STATES DETENTION MEMO                3
3:26-cr-00111 WHO



Using still images from the surveillance video footage, SFPD broadcasted the description of the vehicle and the suspects on the morning of July 31, 2025, four days after the shooting. That same evening, SFPD patrol officers located the vehicle with four occupants driving through the Bayview District. After the vehicle ran a stop sign, SFPD initiated a traffic stop. When the vehicle finally stopped, three occupants, including the defendant, immediately exited the vehicle and walked towards a pizza shop. The driver remained in the vehicle. As the driver was speaking to one of the officers, another officer who just arrived began to approach the vehicle from the rear and noticed the driver reaching his arm towards the rear floorboard behind the front passenger seat. The officer instructed the driver to stop reaching and, once the driver stopped, the officer directed his flashlight to the rear floorboard of the vehicle and saw in plain view a two-tone semiautomatic rifle with an extended magazine. The firearm was a Palmetto State Armory Dagger Compact Pistol with an extended magazine containing 19 rounds of Luger-branded ammunition, including a live bullet in the chamber.

Subsequent DNA testing confirmed that the defendant likely possessed the Palmetto firearm. All vehicle occupants, except the defendant, provided their DNA on the night of the traffic stop. The defendant refused to provide his DNA that night. SFPD thus obtained a warrant to collect the defendant's DNA.[1]

---

[1] SFPD conducted a Mirandized interview of the defendant in San Francisco County Jail when his DNA was collected. An officer asked the defendant whether his DNA would be on the Palmetto firearm. The defendant initially responded: "I'm trying to think, cause sh**, I be getting drunk so much." He then eventually answered: "I don't know" because he's "held a few [] guns," including the second firearm recovered in the vehicle (which is not at issue in this case) that belonged to the driver.

Testing showed very strong support, with a likelihood ratio of 4.48 billion, that the defendant was included as a contributor to the DNA swabbed from the Palmetto firearm grip. Testing also showed very strong support that the other three vehicle occupants were excluded as contributors to the DNA swabbed from the Palmetto firearm grip.

In addition, SFPD determined that the Palmetto firearm was used in the shooting incident. After conducting ballistics testing, the 17 spent cartridge casings were microscopically identified by SFPD as being discharged from the Palmetto firearm.

Last, the Palmetto firearm and 19 rounds of unspent ammunition traveled in interstate commerce. An agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), specializing in interstate nexus, reviewed the Palmetto firearm and the rounds of Luger-branded ammunition recovered in this case. In his opinion, the firearm and ammunition were manufactured outside the State of California and travelled through and/or affected interstate commerce before SFPD seized them.

## III.    LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk–the government need not prove that both factors are present. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Id.*

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Those factors are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol use, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature and seriousness of the

danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

The Rules of Evidence do not apply at a detention hearing. 18 U.S.C. § 3142(f)(2)(B). It is well settled that at a detention hearing, the government may present evidence by way of an evidentiary proffer sufficient to make the court aware of the defendant's role in an offense, the weight of the evidence against the defendant, and other relevant factors. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 743 (1987).

## IV.    ARGUMENT

Although the defendant is only 38 years old, he has accrued a staggering criminal history replete with assault, battery, robbery, and burglary, including numerous offenses while on probation and a parole violation. Neither the defendant's six-year prison sentence for severely injuring a minor victim, nor his subsequent convictions resulting in over 300 days in jail, deterred him from committing further crimes. In this case, the defendant recklessly discharged his firearm 17 times into the air, including firing several rounds as a passenger in a moving vehicle. Then, just four days later, the defendant was found possessing the same firearm with 19 additional rounds of ammunition, including a live round in the chamber. The defendant now faces his most significant period of incarceration to date. His conduct in this case and his extensive criminal history yields a substantial guidelines range, which gives the defendant strong incentive not to appear for future proceedings. This Court should order the defendant detained pending trial because the instant conduct and the defendant's criminal history provide clear and convincing evidence that he presents a danger to any other person or the community, and his history of disregarding court direction, committing crimes while on probation and parole, and the weight of the evidence and potential penalty provide a preponderance of the evidence that he presents a risk of nonappearance. Each of the statutory factors set forth in 18 U.S.C. § 3142(g) weighs in favor of detention.

### A.  Danger to the Community

The nature and circumstances of the charged offense, in conjunction with the defendant's criminal history, demonstrate by clear and convincing evidence that he is a danger to any person or the community. The defendant has a protracted history of violent offenses, including robbery and assault with great bodily injury on a minor victim, threatening with the intent to terrorize, battery, and burglary. The defendant is also subject to an active criminal protective order that requires him not to harass a female victim and

prohibits him from possessing a firearm or ammunition. This history is in addition to the numerous times the defendant has been arrested and charged, but not convicted, of violent offenses, including for domestic violence. In this case, surveillance footage shows the defendant pulling out a firearm with an extended magazine from his waistband and discharging it into the air 17 times – without any regard to the innocent bystanders nearby who visibly panicked after each set of shots rang out. Just four days later, the defendant was found with the same firearm and 19 more rounds of ammunition, including a live round in the chamber—which would have enabled the defendant to engage in similar or even more dangerous conduct. Finally, after these events occurred, the defendant told SFPD that he could not recall if his DNA might be on the firearm in question, because he sometimes gets too drunk to remember things and he regularly holds firearms. The defendant has shown himself to be a repeatedly violent, unrepentant, and clear danger to the general public.

### B. Risk of Nonappearance

The defendant's crime is extremely serious and carries with it severe penalties. His criminal history and specific facts of this case expose him to a substantial sentencing guidelines range. While the defendant has experience with the state criminal justice system, the more severe penalties provided for in the federal system create a new and stronger reason for him to not appear in future proceedings in this court.

Most critically, the defendant has a long history of failing to abide by the terms of his court-ordered supervision, including sustaining five criminal convictions while on probation and a parole violation. The defendant also ignored a court order explicitly prohibiting him from possessing a firearm or ammunition. The defendant is not someone the Court can rely upon to adhere to its directions, whether to appear in court or otherwise. There is, at least, a preponderance of evidence that no condition or combination of conditions will reasonably mitigate the defendant's risk of nonappearance.

In addition, the weight of the evidence in this case weighs strongly in favor of detention based on risk of nonappearance. The defendant's DNA was found on the firearm, ballistics testing confirmed that the firearm was used in the shooting, and surveillance video footage shows the defendant was the shooter. Simply put, there is a very high likelihood of conviction followed by a lengthy term of incarceration. That provides a strong incentive for the defendant not to appear in court as required. *See United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (strong evidence of guilt "makes it more likely he will flee").

**C. The Court Should Not Adopt Pretrial Services' Recommendation**

The government respectfully disagrees with pretrial services' recommendation that the defendant be released in this case on a $10,000 unsecured bond along with relatively standard conditions. These conditions are not tethered in any meaningful way to this defendant's criminal history and offense conduct in this case. Further, the proposed sureties are problematic for a variety of reasons.

The government reserves its right to present its specific arguments during the detention hearing as to why this Court should not adopt pretrial services' recommendation.

**V.      CONCLUSION**

For the foregoing reasons, there is clear and convincing evidence that no condition or combination of conditions can reasonably assure the safety of any other person or the community, and at least a preponderance of the evidence that no condition or combination of conditions can reasonably assure the defendant's appearance in court as required. The government respectfully requests that the Court order the defendant detained pending trial.

DATED: March 24, 2026                                  Respectfully submitted,

                                                       CRAIG H. MISSAKIAN
                                                       United States Attorney


                                                       */s/ Anupam Dhillon*
                                                       ANUPAM DHILLON
                                                       Assistant United States Attorney

UNITED STATES DETENTION MEMO          8
3:26-cr-00111 WHO